## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

SABRINA WALLS-BROWN, CRAIG
BROWN, and C.B.,

              Plaintiffs,

     v.

CRETE-MONEE COMMUNITY
SCHOOL DISTRICT 201-U, LINNEA
HOFMAN, REANN HALFELDT,
JOHN KONECKI, VILLAGE OF
CRETE, and OFFICER MICHAEL
BUZAN in his individual and official
capacity,

              Defendants.

No. 20-cv-5688

Judge John F. Kness

## MEMORANDUM OPINION AND ORDER

Plaintiffs Sabrina Walls-Brown, Craig Brown, and C.B. (a juvenile) sued Defendants Crete-Monee Community School District 201-U (the District) and its employees Linnea Hofman, Raeann Halfeldt, and John Konecki (collectively, the District Defendants), and the Village of Crete Police Department and Officer Michael Buzan (the Village Defendants), alleging racial discrimination arising out of a conspiracy to remove Black children from school and force them into the criminal justice system. Both the Village Defendants and the District Defendants now move for summary judgment. (Dkt. 93, 101.)

As explained below, no genuine issues of material fact remain for resolution. And because the factual record is insufficient for Plaintiffs to meet their burdens of proof, Plaintiffs' claims fail as a matter of law. Accordingly, all Defendants are entitled to judgment.

## I.    BACKGROUND

This case stems from the aftermath of a fight that occurred in Crete-Monee High School between Plaintiff C.B. (who is Black) and another student. One year before the fight, the school had enacted an Individualized Education Plan (IEP) for C.B. to accommodate what the school considered to be C.B.'s disability. (*Id.* at 3.) That IEP noted C.B.'s "deficits in all core academic skills" and established the goal of "develop[ing] self-awareness and self-management skills to achieve school and life success." (*Id.*) It also listed as goals: "[c]ontinue to maintain appropriate behavior even when frustrated" and "[e]ngage in appropriate behavior when confronted with inappropriate behavior." (Dkt. 119 at 3.)

At least two fights occurred about a week apart between C.B. and another student. (Dkt. 113 at 20.) After the first fight, Plaintiff Sabrina Walls-Brown, C.B.'s mother, notified Crete-Monee High School's Dean of Students that the other student had made threats to C.B. on social media. (*Id.* at 21.) The Dean called a meeting between the parents of the students, but the other student's parents did not show up to the meeting. (*Id.*)

A week later, C.B. and the other student fought again. Defendant Hofman,[1] a guidance counselor, and Defendant Halfeldt, a special education teacher, intervened in the altercation and escorted C.B. to a nearby unoccupied room. Hofman stood at the door to the room, and C.B., after removing her artificial nails and adjusting her hair, approached Hofman. What happened next is disputed. C.B. testified that Hofman placed her hands on C.B., preventing C.B. from leaving, and C.B. put her hands on Hofman's arm. In contrast, Hofman and Halfeldt testified that C.B. placed her hands on Hofman and pushed Hofman against the door, injuring Hofman. Defendant Konecki, observing the incident from outside the room, testified that C.B. struck Hofman. (Dkt. 113 at 4–6.)

The parties agree on most of the rest of the story. Konecki entered the room and ordered C.B. to sit down; C.B. complied. (*Id.* at 7.) C.B. was escorted to the Dean's office, where she filled out a student incident report. (*Id.*) In her report, C.B. admitted to placing her hands on Hofman. (*Id.*) Hofman, Halfeldt, and Konecki also prepared incident reports. (*Id.*)

Defendant Officer Buzan responded to the school's call for police assistance. (*Id.* at 8.) Officer Buzan did not know Hofman or Halfeldt, but Officer Buzan believes that he knew Konecki. (*Id.* at 9.) Officers Buzan, Hofman, Halfeldt, or Konecki all stated that they did not know C.B. before the altercation. (*Id.*) Officer Buzan was not aware that C.B. had been placed on an IEP. (*Id.*) Officer Buzan spoke with Hofman,

---

[1] In their submissions, Plaintiffs spell this Defendant's last name both as "Hofman" and "Hoffman." Because the corrected complaint (Dkt. 34) uses the spelling "Hofman" in the caption, this opinion adopts that spelling.

Halfeldt, and Konecki and reviewed their incident reports alongside C.B.'s report. (*Id.* at 8–10.) Hofman told Officer Buzan that she wanted to press charges. (*Id.* at 11.) Officer Buzan completed a juvenile case report and referred the matter to juvenile court. (*Id.*) Officer Buzan allowed C.B. to go home with her older sister. (*Id.*)

After the matter had been referred to the Will County State's Attorney's office, C.B. was charged as a juvenile with aggravated battery. (*Id.* at 16.) C.B., by that time represented by an attorney and with her parents' knowledge and consent, formally admitted to facts supporting the aggravated battery charge. (*Id.*) C.B. was sentenced to court supervision and monetary fines, and Plaintiffs explain that the case has since been expunged. (*Id.* at 16–17.)

The Crete-Monee High School administration recommended to the District that C.B. be expelled pending the outcome of a "manifestation determination review" intended to consider what role, if any, her disability played in the altercation. (Dkt. 113 at 21.) But before the District determined whether to expel C.B., C.B. voluntarily transferred to another school. (*Id.*)

Plaintiffs contend that, over a month after the fight, an organization called the Chicago Lawyers Committee gave a presentation at the Crete-Monee public library concerning the "school to prison pipeline." (Dkt. 114 at 7.) Plaintiffs cite the PowerPoint presentation from that event to explain certain facets of the asserted school-to-prison pipeline theory. (*Id.* at 7–9.) Although Plaintiffs do not provide a clear summary of the theory, Plaintiffs appear to argue that the underlying principle of the theory is that Black students are disciplined disproportionately while in school,

resulting in Black students being disproportionately referred for juvenile prosecution. (Dkt. 112 at 23–24.)

One attendee at the school-to-prison pipeline presentation was Pastor James Hunt. (Dkt. 114 at 7.) Pastor Hunt testified that a former principal of Crete-Monee High School, James Hardin, told Hunt that Hardin "was told that if they did not press charges against children who engaged in assaults or batteries or something along those lines, that he [Hardin] himself would be prosecuted." (Dkt. 115-1 at 32.)

Against this backdrop of the Chicago Lawyers Committee's school-to-prison pipeline presentation and the testimony of Pastor Hunt, Plaintiffs allege that Defendants "pushed C.B. to her psychological, mental, and emotional limits in an effort to facilitate the occurring of the incident and to obtain the written statement from her which eventually led to her charges, that Defendants lied on the true nature and details of the incident to propel C.B. into juvenile proceedings, and that Defendants did so for discriminatory purposes." (Dkt. 112 at 5.)

Plaintiffs' complaint contains twelve counts. As explained in the order (Dkt. 64) granting in part Defendants' motions to dismiss, the numbering of counts in the complaint is inconsistent and duplicative; consistent with the approach taken in the earlier order, therefore, the Court adopts the following numbering of Plaintiffs' counts:

- Count I – 42 U.S.C. § 2000 (Title VI) (*Id.* ¶¶ 34–51)

- Count II – Civil Conspiracy (*Id.* ¶¶ 52–65)

- Count III – Malicious Prosecution (*Id.* ¶¶ 66–73)

- Count IV – Negligent Supervision (*Id.* ¶¶ 74–84)

- Count V – Rehabilitation Act (*Id.* ¶¶ 85–94)

- Count VI – 42 U.S.C. § 1983 (Monell) (*Id.* ¶¶ 95–98)

- Count VII – Intentional Infliction of Emotional Distress (*Id.* ¶¶ 99–104)

- Count VIII – Respondeat Superior (*Id.* ¶¶ 105–07)

- Count IX – 745 ILCS 10/9-102 (*Id.* ¶¶ 108–10)

- Count X – Intentional Infliction of Emotional Distress (*Id.* ¶¶ 111–22)

- Count XI – Negligent Infliction of Emotional Distress (*Id.* ¶¶ 123–36)

- Count XII – Americans with Disabilities Act (ADA) (*Id.* ¶¶ 137–44)

(Dkt. 64 at 3.) Counts III and XI were dismissed in full and Counts V and XII were dismissed as to all Defendants other than District 201. (*Id.* at 1.) The Village Defendants now move for summary judgment (Dkt. 93), as do the District Defendants (Dkt. 101).

## II.    STANDARD OF REVIEW

Summary judgment is warranted only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Jewett v. Anders*, 521 F.3d 818, 821 (7th Cir. 2008) (quoting *Magin v. Monsanto Co.*, 420 F.3d 679, 686 (7th Cir. 2005)); *see also* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322−23 (1986). Rule 56(c) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish

the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. As the " 'put up or shut up' moment in a lawsuit, summary judgment requires a non-moving party to respond to the moving party's properly supported motion by identifying specific, admissible evidence showing that there is a genuine dispute of material fact for trial." *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017) (quotations omitted).

## III. DISCUSSION

Much of the theory behind Plaintiffs' complaint, as verified by Plaintiffs' Local Rule 56.1 statements and response briefs, hinges on the existence of the alleged school-to-prison pipeline and the contention that Defendants' actions were connected to it. (*See, e.g.,* Dkt. 111 at 28 ("C.B. claims that Defendants are engaged in a discriminatory practice that propels a large number of African American students into juvenile proceedings. The existence of such practice is substantiated by Pastor Hunt's statements and the work of *Save our Schools* and of the Chicago Lawyers Committee[.] The practice is a known fact in the local community."); *id.* at 26 ("Pastor Hunt's testimony, and the work of Save our Schools and of the Chicago Lawyers Committee for Civil Rights, prove the existence of a discriminatory practice – the school to prison pipeline – that deliberately propels a large number of African American students into juvenile proceedings.")) Plaintiffs essentially argue that the existence of the school to prison pipeline is all that is needed to establish that Defendants took actions with discriminatory intent. (*See, e.g.*, Dkt. 112 at 5 (Defendants took wrongful actions against C.B. "for discriminatory purposes (see

7

'School to Prison Pipeline' process and evidence of its existence.)"); Dkt. 111 at 26 ("Defendants' acts . . . fit squarely within such practice – the school to prison pipeline").)

Whether Plaintiffs' underlying theory of a school-to-prison pipeline is accurate does not control the outcome of this case, as it is Plaintiffs' burden to show that the evidence presented in discovery is sufficient to place the matter before a trier of fact as to these Defendants. On that score, Plaintiffs fail at their task. To prove the existence of the school-to-prison pipeline, Plaintiffs rely on a presentation made by the Chicago Lawyers Committee and the testimony of Pastor Hunt. Plaintiffs filed the presentation on the docket but provided only the testimony of a member of the audience, Pastor Hunt, to establish that the presentation was given. The admissibility of this presentation is highly questionable, but even if the Court were to consider it as evidence at this juncture, the presentation itself does not do the work Plaintiffs argue that it does: it does not prove that any Defendant acted in accordance with or in furtherance of the theory it puts forth.

According to Plaintiffs, the presentation asserted facts such as "Black students represent 31% of school-related arrests" and "Black students are suspended and expelled 3x more than white students." (Dkt. 115 at 4.) It also highlighted other statistics of questionable relevance here, such as that 98.56% of the "incidents" from School Year 2016–17 (assumedly from the District) are labeled "other reason." (*Id.* at 9.) The presentation advertises "what [] the Chicago Lawyers' Committee do[es] to combat [the school-to-prison pipeline]" and urges the audience to "know the code of

8

conduct." (*Id.* at 13–15.) It then explains what suspension and expulsion mean and what a suspended or expelled student's rights are. (*Id.* at 17–24.) This bare-bones presentation—unaccompanied by expert analysis, generalized in nature, and unspecific to the conduct of Defendants—is insufficient to create a triable issue in this case.

Pastor Hunt's testimony fares no better. Pastor Hunt recounted the statement of former principal James Hardin that Hardin would be targeted (by the Village of Crete Police Department, in Pastor Hunt's view) if he did not refer [for prosecution] "children who engaged in assaults or batteries." (Dkt. 115-1 at 32.) Pastor Hunt said nothing about whether Hardin told him he would be in trouble for not referring for prosecution Black children (as opposed to children in other demographic groups) who engaged in assaults or batteries. (*Id.*) Moreover, Pastor Hunt testified that Hardin held no position in the School District at the time of C.B.'s referral for juvenile prosecution. Even if Hardin's statement as recounted by Pastor Hunt were admissible (an unlikely proposition), it does not on its own provide evidence sufficient to establish a genuine issue that Defendants in this case either issued that threat or operated in fear of it.

This material does not establish a genuine issue of fact as to the existence of the alleged school-to-prison pipeline relative to Defendants' actions in this case. Even assuming the existence of statistically disproportionate disciplinary action against Black students, that fact, without more, does not establish that Defendants in this case engaged in racially discriminatory conduct when C.B. was disciplined and

referred for juvenile prosecution. Plaintiffs' reliance on the allegations of a school-to-prison pipeline thus cannot mask their failure of proof that any Defendant violated Plaintiffs' rights in this case.

Assessing Plaintiffs' school-to-prison theory in this way provides an essential backdrop to addressing the specifics of Defendants' motions for summary judgment. Plaintiffs have advanced several legal theories that they contend justify relief in their favor. But despite the variegated nature of Plaintiffs' complaint, the evidence developed in discovery is of a whole. Accordingly, each of Plaintiff's theories, and Defendants' challenges to those theories, is addressed in the light of that evidence.

### A.    Count I: Violation of Title VI against District Defendants

Plaintiffs' first count alleges a violation of Title VI of the Civil Rights Act of 1964, codified at 42 U.S.C. § 2000d *et seq.* (Dkt. 34 at 7–11.) That statute establishes that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d.

As an initial matter, the District Defendants argue that Count I—among other Counts—is barred by the doctrine set forth in *Heck v. Humphrey*, 512 U.S. 477 (1994) because C.B.'s "juvenile adjudication would be invalidated if she were permitted to recover in this lawsuit because it would negate her admission" that provided the basis for her juvenile conviction. (*See* Dkt. 120 at 11.) In contrast, Plaintiffs contend that *Heck* does not apply because "C.B.'s focus [in this complaint] is on the school, its

10

employees, and Officer Buzan's acts and omissions leading up to her summons," which does not implicate "the constitutionality of her adjudication." (Dkt. 111 at 23.)

*Heck* does not bar this case. The parties do not dispute that: (1) C.B. made physical contact with Hofman (Dkt. 113 at 5); (2) C.B.'s incident report admitted that she made that contact (*id.* at 7); (3) Officer Buzan reviewed C.B.'s report before referring the incident for juvenile prosecution (*id.* at 11); (4) contact is all that was necessary to secure C.B.'s conviction (Dkt. 112 at 23); and (5) C.B., while represented by counsel and with her parents' knowledge and consent, entered an admission in a judicial proceeding to the offense of aggravated battery (Dkt. 113 at 16). The allegations contained in the complaint do not implicate the constitutionality of C.B.'s conviction because none of those five facts are in dispute. Rather, Plaintiffs allege discriminatory actions that, at best, inform the background of C.B.'s conviction. As an example, Plaintiffs infer that Hofman, Halfeldt, and Konecki lied in their statements to Officer Buzan to ensure Officer Buzan arrested C.B. because C.B. was Black. (Dkt. 34 at 8.) But C.B.'s conviction would have been justified even in the absence of those reports; a determination that those reports were false and that they were made for the purpose of denying C.B.'s participation in school because of her race would not implicate the constitutionality of her conviction. Accordingly, the *Heck* bar does not apply.

On the merits, Plaintiff alleges that Defendants Hofman, Halfeldt, and Konecki violated Title VI through their actions following C.B.'s fight: "Hoffman [*sic*], Halfeldt and Konecki's treatment of CB and subsequent statements made to Buzan

11

intended to justify said treatment were racially motivated and was an attempt to stereotype CB, a [B]lack girl, violent and to have her arrested and charged as a criminal." (*Id.* at 8.) And "[i]n confining CB to a room and restraining her, calling the police and having her arrested and charged with a felony, all based upon race, Hoffman [*sic*], Halfeldt and Konecki's actions were willful, malicious and in bad faith, with an improper motive of depriving CB of her liberty with a malicious intent of violating CB's civil rights." (*Id.*)

Defendants argue that Plaintiffs provide no evidence that Defendants' actions were racially motivated. (Dkt. 101 at 11.) That absence, Defendants argue, dooms Plaintiffs' Title VI claims. (*Id.* at 11–12) Plaintiffs respond that Pastor Hunt's testimony, coupled with the Chicago Lawyers Committee presentation, "prove the existence of a discriminatory practice – the school to prison pipeline" and that the allegations contained in Count I "fit squarely within such practice." (Dkt. 111 at 24–25.) Plaintiffs also argue that Defendants' denials that race played a role in their actions "is the exact reason why this case presents genuine issues of material facts that must go to a jury." (*Id.* at 26.)

Defendants are correct that Plaintiffs identify no evidence that Defendants Hofman, Halfeldt, or Konecki acted with racial animus with the purpose of excluding C.B. from school. As noted above, the Chicago Lawyers Committee presentation and Pastor Hunt's testimony do not link Defendants' actions to the alleged widespread societal discrimination called the "school-to-prison pipeline." At worst, Defendants lied on their incident forms and Defendant Hofman lied about her injuries; but even

12

that does not present a genuine question that the Defendants lied with discriminatory intent.

As for the District, Plaintiffs allege in Count I that the District violated Title VI because it "does not treat similarly situated white students by having them arrested and charged with a felony when they are on an IEP, attacked by another student, have an encounter with a teacher, or become engaged in a fight." (Dkt. 34 at 8.) But Plaintiffs do not provide any evidence supporting this allegation of disparate treatment based on race. Plaintiffs also infer in their response to Defendants' motion for summary judgment that the District "can absolutely be held liable for the conduct of its agents under a Title VI theory." (Dkt. 111 at 15.) But Plaintiffs fail to present evidence sufficient to support the claim that the individual District Defendants violated Title VI. Plaintiffs argue in their response brief that the Dean's deficient actions in response to Plaintiff Sabrina Walls-Brown's alerting him of the other student's threatening social media posts can give rise to liability. (*Id.* at 14–15.) But, again, Plaintiffs fail to put forth any evidence that the Dean's actions constituted race-based discrimination.

Plaintiffs also contend in Count I that the District "does not harass and investigate white students who live in Crete or Monee for compliance with residency requirements, subjecting them to morning and afternoon surveillance from vehicles stationed within the neighborhood and force them to bring in lease agreements and current utility bills to prove their residency within the school district." (Dkt. 34 at 8.)

13

Plaintiffs argue that these residency investigations were but "[one] part of the discriminatory treatment to which [Plaintiffs] were subjected." (Dkt. 112 at 6.)

Plaintiffs' proffered evidence relating to residency investigations does not create a genuine issue of fact concerning race-based discrimination. Plaintiffs note in their statement of additional facts that the Chicago Lawyers Committee presentation also discussed "residency," which the Court takes to mean the residency requirements established for enrollment in District schools. (Dkt. 119 at 12.) Pastor Hunt testified that the District planned to hire an outside entity to investigate student residency, and that it was the perception of the Save Our Schools organization that the investigation "was targeted at African-American students that were coming in." (Dkt. 115-1 at 16.) And Plaintiff Sabrina Walls-Brown testified that she received one letter from the District explaining that the District was reviewing whether she had proper residency to attend its schools and a second letter from the District explaining that it concluded that she did. (Dkt. 97-6 at 53.) Plaintiffs identify no other facts in either their response to Defendants' joint statement of material facts or Plaintiffs' statement of additional material facts about the residency investigation. This proffered evidence—the perception of an advocacy organization as related by Pastor Hunt and an example of an effort by the District to confirm the residency of Walls-Brown—fails to create a genuine issue that the residency investigations wrongfully targeted Plaintiffs.

In sum, Plaintiffs fail to identify sufficient evidence that the alleged wrongdoing by the District Defendants was, as Title VI requires, "on the ground of

race, color, or national origin." 42 U.S.C. § 2000d. Summary judgment on Count I is therefore entered in favor of Defendants.

### B.   Count II: Civil Conspiracy

Plaintiffs bring a civil conspiracy claim in Count II. Plaintiffs allege that: (1) Defendants Hofman, Halfeldt, and Konecki conspired together to "deprive black students of the opportunity to participate in the [District] by facilitating the charging of them with felonies and by otherwise"; (2) the District "actively engaged in activities designed to suspend and to force the Black students out of the [District]"; (3) the Village Defendants, by way of the Crete Police Department, participated in the conspiracy by threatening to bring action against school administrators if Black students were not charged; and (4) that Officer Buzon referred C.B. for juvenile prosecution in an attempt to force Black students out of Crete-Monee High School and into the criminal justice system. (Dkt. 34 at 11–13.)

As the Court held in its order denying in part Defendants' motions to dismiss, the parties agreed that a claim for conspiracy under 28 U.S.C. § 1985 requires: (1) a conspiracy; (2) for the purpose of depriving any person or class of persons of the equal protection of the laws or of equal privileges and immunities under the laws; (3) an act in furtherance of the conspiracy; and (4) an injury. (Dkt. 64 at 6.)

The District Defendants argue that Plaintiffs offer no proof of the existence of a conspiracy and that Plaintiffs fail to establish that any alleged action against C.B. was taken because of her race. (Dkt. 101 at 11–12.) The Village Defendants base much of their argument on the second prong: that Plaintiffs failed to identify any evidence

in the record supporting the allegation that Defendants selectively enforced the law against C.B. based on C.B.'s status as a Black student. (Dkt. 93 at 6–7.) Specifically, Defendants argue that Plaintiffs' Section 1985 claim fails because they cannot point to any evidence that shows that Defendants failed to refer non-Black students in similar situations for juvenile prosecution. (*Id.* at 8.) Defendants also note that Officer Buzan had probable cause to refer C.B. to the State's Attorney for juvenile prosecution (*id.*), a fact Plaintiffs do not dispute (Dkt. 112 at 23).

Plaintiffs respond that they have presented sufficient evidence to maintain this claim in the form of the school-to-prison pipeline theory and the testimony of Pastor Hunt. (*Id.*) Plaintiffs also argue that Defendants incorrectly focus on Buzan's probable cause, when they should focus on "why Officer Buzan did not exercise [his] discretion" when he referred C.B. for juvenile prosecution. (*Id.* at 25.) "THAT is where the conspiracy is." (*Id.*) Defendants argue[2] that Pastor Hunt's testimony does not support the conspiracy allegation because the statement does not describe any discriminatory conduct; Pastor Hunt said that Hardin's concern was about "children who engaged in assaults or batteries," not Black children specifically who engaged in assaults or batteries. (*Id.* at 14.)

Plaintiffs essentially argue that Defendants Hofman, Halfeldt, and Konecki lied when recounting the altercation, and that those Defendants acted in concert with

---

[2] Defendants also argue that Pastor Hunt's statement is inadmissible hearsay and therefore may not be considered at the summary judgment stage. (Dkt. 118 at 4–5.) Because this argument is raised in Defendants' reply brief, Plaintiff has not responded to it. Regardless, Pastor Hunt's testimony, even if admissible, does not sufficiently establish the existence of a conspiracy with the purpose of depriving any person or class of persons the equal protection of the laws.

school administrators and the Village of Crete through Officer Buzan with the purpose of sending a Black student (C.B.) from school into the criminal justice system. But Plaintiffs offer no evidence that any of the individual Defendants independently agreed to join the alleged conspiracy. Plaintiffs also fail to identify any evidence that Defendants' actions toward C.B. were discriminatory: Plaintiffs provide no evidence that Defendants deliberately chose not to refer non-Black students engaged in fights for juvenile prosecution.[3] And as above, the pipeline presentation does not establish any facts on which a trier of fact reasonably could determine the existence of a conspiracy between Defendants to deprive C.B. or any class of persons equal protection of the laws, an act in furtherance of that conspiracy, or C.B.'s alleged injuries.

Finally, Officer Buzan is shielded by qualified immunity. When a defendant raises the defense of qualified immunity, "the plaintiff bears the burden of defeating it by showing that (1) the defendants violated a constitutional right and (2) the constitutional right was clearly established at the time of the violation." *Garcia v. Posewitz*, 79 F.4th 874, 879 (7th Cir. 2023) (internal quotations and citations omitted). Plaintiffs argue that Officer Buzan is not entitled to qualified immunity because his investigation was insufficient. But Plaintiffs quote *BeVier v. Hucal*, 806 F.2d 123, 128 (7th Cir. 1986) for the proposition that "officers are required to pursue

---

[3] To establish that a purpose of the conspiracy was to deprive a person or class of persons equal protection of the laws, a plaintiff must allege "some racial, or perhaps otherwise class-based invidiously discriminatory animus behind the conspirators' action." *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971).

'reasonable avenues of investigation' and cannot ignore 'facts that would help clarify the situation,' but they are permitted to end their investigation once probable cause has been established." (Dkt. 112 at 27 (emphasis added).) Although Plaintiffs argue that "Officer Buzan's acts and omissions are not reasonable, they are actually an integral and enabling part of the 'school to prison pipeline process' and he is not entitled to immunity on the basis of pretexts" (*id.* at 28), Plaintiffs admit that Officer Buzan had probable cause to refer C.B. for juvenile prosecution and cite a case establishing that probable cause can properly be the end of a police officer's investigation. Plaintiffs therefore do not carry their burden of defeating Defendants' qualified immunity defense.

In sum, Plaintiffs fail to identify sufficient evidence in the record establishing a genuine issue of fact (1) regarding the existence of a conspiracy between Defendants to deprive Black students of the equal protection of the laws, or (2) that any Defendant acted in furtherance of this conspiracy in causing C.B.'s referral for juvenile prosecution. Summary judgment is therefore entered in favor of all Defendants as to Count II.

## C.    Count IV: Negligent Supervision

In Count IV, Plaintiff alleges that the District failed to train, supervise, and monitor their employees. Defendants argue that the District is immune under 745 ILCS 10/3-108(a). (Dkt. 101 at 11–12.) Plaintiffs did not respond to this argument; the Court will thus find that there are no genuine issues of fact on this count requiring trial and that the District is entitled to judgment as a matter of law.

*See Flynn v. Sandahl*, 58 F.3d 283, 288 (7th Cir. 1995.) Summary judgment is therefore entered in favor of Defendants as to Count IV.

### D.    Count VI: *Monell* Claim

Plaintiff's *Monell* claim is premised on the school-to-prison pipeline theory and Pastor Hunt's testimony. (Dkt. 112 at 29.) The deficiencies in both pieces of evidence that rendered them insufficient to defeat summary judgment on Plaintiffs' conspiracy claims apply here as well. Plaintiffs contend that the school-to-prison pipeline is a "widespread practice" sufficient to establish a "custom or usage" under *Monell*. (*Id.* (quoting *Baxter v. Vigo County School Corp.*, 26 F.3d 728, 735 (7th Cir. 1994)).) But that evidence is insufficient to establish any such widespread practice or to show that Defendants are liable in this case. Accordingly, and for the reasons set forth more fully above, summary judgment is entered in favor of Defendants on Plaintiffs' *Monell* claim.

### E.    Counts VII – IX: IIED against Village Defendants

Count VII alleges a state law claim of intentional infliction of emotional distress against Officer Buzan; Count VIII alleges the liability of the Village of Crete for Officer Buzan's torts under the doctrine of *respondeat superior*; and Count IX alleges a claim against the Village of Crete under 745 ILCS 10/9-102. (Dkt. 34 at 21–22.) Defendants argue that these claims are barred by the Illinois Tort Immunity Act, 745 ILCS 10/2. (Dkt. 93 at 13.)

As Plaintiffs explain, the Illinois Tort Immunity Act "entitles local government employees to immunity from tort liability in the execution of enforcement of any law

unless their conduct is willful and wanton." (Dkt. 112 at 30 (quotations and citations omitted).) Plaintiffs argue that Officer Buzan's actions were willful and wanton, reflecting his "actual or deliberate intention to cause harm." (*Id.*)

It is undisputed that Officer Buzan acted with probable cause when he referred C.B. for juvenile prosecution. Not only does that preclude a finding that Officer Buzan's actions were willful and wanton, but Illinois law requires that result: "[a] public employee is not liable for injury caused by his instituting or prosecuting any judicial or administrative proceeding within the scope of his employment, unless he acts maliciously *and without probable cause*." 745 ILCS 10/2-208 (emphasis added). And because Officer Buzan cannot be liable for Plaintiffs' state law claims, the Village of Crete cannot be liable for them under a theory of *respondeat superior* or under 745 ILCS 10/9-102. Finally, the state law claims brought by Plaintiffs Sabrina Walls-Brown and Craig Brown are barred by the one-year statute of limitations. *See* 745 ILCS 10/8-101. Officer Buzan's alleged wrongful actions in this case occurred on February 8, 2018—the date of the fight and Officer Buzan's investigation and referral—and this case was originally filed on March 1, 2019 (over a year later). (*See* Dkt. 93 at 13.) Plaintiffs' state law-based claims are thus untimely.

For these reasons, summary judgment is entered in favor of Defendants for Counts VII–IX.

### F. Counts V and XII: Violations of Rehabilitation Act and ADA

Defendants argue that summary judgment is proper on Plaintiffs' claims under the Rehabilitation Act and the Americans with Disabilities Act (ADA) because

20

Plaintiffs failed to exhaust the required administrative remedies under the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § 1400 *et seq*. (Dkt. 101 at 14.) Plaintiffs argue that, under the standard set forth in *Fry v. Napoleon Community Schools*, 580 U.S. 154 (2017), exhaustion is unnecessary. (Dkt. 111 at 30.)

The IDEA was established to "ensure[] that children with disabilities receive needed special education services." *Fry*, 580 U.S. at 157. IDEA Section 1415(l) "requires that a plaintiff exhaust the IDEA's procedures before filing an action under the ADA, the Rehabilitation Act, or other similar laws when (but only when) her suit seeks relief that is also available under the IDEA." *Id.* at 165 (internal quotation omitted). As the Supreme Court held, exhaustion is required "when the gravamen of a complaint seeks redress for a school's failure to provide a [free appropriate public education], even if not phrased or framed in precisely that way." *Id.* at 170. To help determine when this is the case, the Supreme Court posed two hypothetical questions: (1) "could the plaintiff have brought essentially the same claim if the alleged conduct had occurred at a public facility that was *not* a school—say, a public theater or library?" And (2) "could an *adult* at the school—say, an employee or visitor—have pressed essentially the same grievance?" *Id.* at 171. If the answer to those questions is yes, exhaustion is not required because the gravamen of the claim is likely not the "adequacy of special education" as governed by the IDEA. *Id.* at 172. But if the answer to both questions is no, the claim likely falls under the IDEA and exhaustion is required. *Id.* at 172–73.

21

Defendant points to paragraph 92 of the complaint to argue that the gravamen of Plaintiffs' Rehabilitation and ADA claims is the provision of special education and falls, therefore, under the IDEA and its requirement of exhaustion. (Dkt. 101 at 18.) Paragraph 92 of the complaint is a paragraph within Plaintiffs' Rehabilitation Act claim and alleges that "District 201 U did not: a) conduct a bona fide and proper individualized assessment; b) engage in the interactive process; c) explore reasonable modifications and/or accommodations; and/or d) allow CB to remain in school; e) protect CB from being charged with a felony, when they knew her behavior was in line with her behavioral disabilities identified in her IEP." (Dkt. 34 at 18.) Defendants argue that "[t]hese allegations all revolve around C.B.'s status as a student at a school" (Dkt. 101 at 18) and therefore the answer to both hypothetical questions is no (Dkt. 120 at 13).

Plaintiffs respond, in toto, that the answers to the *Fry* questions "are a resounding 'YES'." (Dkt. 111 at 30.) Instead of expounding on that argument, Plaintiffs contend that "Defendants have taken it upon themselves to answer the questions in the negative [] because a negative answer suits their desire to have the case dismissed on procedural grounds, later [*sic*] than litigating the merits of it." (*Id.*)

The IDEA's exhaustion requirement is a statutory mandate, not a litigation dodge crafted by Defendants. Without the benefit of a fuller argument by Plaintiffs, the Court finds Defendants' position persuasive. The crux of Plaintiffs' ADA and Rehabilitation Act claims is the alleged wrongfulness and inadequacy of the District's actions towards C.B. given her disability as set forth in her IEP, which negatively

affected C.B.'s education. Those claims go to the adequacy of the education the District provided and could not have been brought against, for example, a public library; nor could they have been brought by an adult. *See Fry*, 580 U.S. at 171–73. Exhaustion of administrative remedies was therefore required. Because Plaintiffs did not identify any evidence indicating that such exhaustion occurred, the claims cannot proceed. Summary judgment as to Counts V and XII is therefore entered in favor of Defendants.

### G.  Count X: IIED against individual District Defendants

Count X alleges that Defendants Hofman, Halfeldt, and Konecki are liable for intentional infliction of emotional distress (IIED) because they "refus[ed] to call [Plaintiff] Sabrina [Walls-Brown] when CB, knowing that she had an IEP, asked to be allowed to call her mother, and then call[ed] the police on CB." (Dkt. 34 at 23.)

At the outset, Defendants argue that none of the individual District Defendants knew that C.B. had an IEP. (Dkt. 101 at 17.) Defendants then argue that not allowing C.B. to call her mother and instead reporting C.B.'s conduct to the police does not rise to the level of outrageous conduct necessary to sustain an IIED claim. (*Id.* at 30–31.) Plaintiffs respond only by asserting that "a reasonable juror [could] find that the stress C.B. suffered was severe and Defendants' conduct was outrageous enough to prove IIED." (Dkt. 111 at 30.)

As to Defendants' knowledge of C.B.'s IEP, Defendants Hofman, Halfeldt, and Konecki all testified that they did not know about it. (Dkt. 113 at 8.) Plaintiffs dispute that fact, arguing that Defendants "are supposed to have constructive knowledge of

the IEP." (*Id.*) Plaintiff offers no analysis of why that is the case and identifies no evidence to controvert Defendants' stated lack of knowledge. As a result, there is no genuine dispute that Defendants did not have knowledge of C.B.'s IEP. In view of this factual record, Defendants' refusal to allow C.B. to call her mother and act of calling the police does not constitute sufficiently outrageous conduct from which a jury reasonably could premise an IIED verdict. Summary judgment is therefore entered in favor of Defendants on Count X.

## IV. CONCLUSION

Defendants' motions for summary judgment are granted.

SO ORDERED in No. 20-cv-05688.

Date: September 15, 2025

_____
JOHN F. KNESS
United States District Judge